**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **KARI K. KIETZER,** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **CIVIL ACTION NO. _____** |
| **vs.** | § | |
| | § | *JURY DEMANDED* |
| **MEALS ON WHEELS MINISTRY, INC.** | § | |
| **a Texas Non-Profit Corporation** | § | |
| *Defendant.* | § | |

## PLAINTIFF KARI K. KIETZER'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

NOW COMES Plaintiff KARI K. KIETZER ("Plaintiff"), and files this Original Complaint complaining of Defendant MEALS ON WHEELS MINISTRY, INC. ("Defendant" or "MOWM"), and would show the Court as follows:

**I.**
## JURISDICTION AND VENUE

1.     This Court has Federal Question Jurisdiction to hear the merits of Plaintiff's discrimination claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e et seq., under the Equal Pay Act, 29 U.S.C. § 206(d) et seq., and under 28 U.S.C. § 1331.

2.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission, and received a notice of Right to Sue less than 90 days prior to the commencement of this action.

3.     Plaintiff requests the Court to exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367.

4.   Venue is proper in the Eastern District of Texas, Tyler Division under 28 U.S.C. § 1391.

## II.
## PARTIES

5.   Plaintiff KARI K. KIETZER is a resident of Smith County, Texas.

6.   Defendant MEALS ON WHEELS MINISTRY, INC., a non-profit corporation organized under the laws of the State of Texas and doing business as Meals on Wheels of East Texas.  Defendant may be served with process by serving Trudy M. Williams, its registered agent, at 3001 Robertson Road, Tyler, Texas 75701, the corporation's registered address.

## III.
## FACTS OF CASE

**A.**   **Background**

   **1.   Meals on Wheels Ministry**

7.   Meals on Wheels Ministry, Inc. ("MOWM") delivers nutritious meals, safety checks, and other services to community members in East Texas.  These services enable seniors, veterans, and disabled persons to remain in their own homes.

8.   Ms. Kietzer is a former Chief Executive Officer of MOWM.

9.   Ms. Kietzer is a female.

10.   Ms. Kietzer was drawn to MOWM because the role allowed her to combine lifelong volunteer experience with her business and fundraising background, while remaining focused on the important needs the organization is designed to meet in East Texas.

11.   MOWM is a member of Meals on Wheels America, which is the largest and oldest organization dedicated to addressing hunger and isolation among seniors.

12. Ms. Kietzer is passionate about empowering community organizations which improve the health and quality of life for seniors, veterans, and disabled persons, ensuring that no one is left hungry or isolated.

13. Ms. Kietzer remains earnest in her belief that providing meals to East Texas community members is a need that will continue to grow over the coming years and that continues to need transparency and accountable processes.

14. MOWM has hundreds of East Texas volunteers.

15. Ms. Kietzer found the grassroots nature of the volunteers serving MOWM inspiring. Delivering meals is a rewarding experience and Ms. Kietzer understood that the friendly smile and hot meal that she, staff, and volunteers provided could often be the only time some homebound seniors would see another person on an average day.  She was inspired daily by the dedication and compassion of the staff and volunteers who ensure thousands of people in East Texas receive a hot meal daily.

16. When she accepted the position of CEO at MOWM, Ms. Kietzer was disappointed to find MOWM did not have office hours, a dress code, staff meetings, credit card policies and procedures, financial checks and balances, and had deficient or nonexistent operational documents, like personnel policies, bylaws and conflict of interest statements.

17. When she accepted the position as CEO, Ms. Kietzer inherited at least $255,486.04 in overdue and unpaid bills and a $149,000.00 deficit.  Ms. Kietzer had to engage a CPA firm to amend MOWM's tax filings for fiscal years 2014, 2015, and 2016 to correct reporting errors related to investment income.

### 2.  Former Executive Director Mike Powell

18.   Mike Powell was the Executive Director of Meals on Wheels Ministry, Inc. until on or about September 19, 2017, when he was discharged.

19.   Powell was on medical leave at the time he was fired.

20.   As a result, Powell filed a federal lawsuit claiming violation of the Family Medical Leave Act.[1]

21.   MOWM settled the lawsuit for an undisclosed amount and the case was dismissed on June 18, 2019.

22.   Mike Powell is male.

23.   Mr. Powell was accused of multiple violations of policy while employed by MOWM.

24.   Mr. Powell's alleged policy violations were either overlooked or handled in a much more private, less stringent manner than Mr. Kietzer's alleged violations.

25.   Upon information and belief, Mr. Powell's wages and additional compensation was greater than what Ms. Kietzer was paid, for the same work, in the same position, and for the same organization.

### 3.  Kari Kietzer Hired as MOWM CEO

26.   Before she was hired by MOWM, Ms. Kietzer was required by MOWM to participate in: an initial meeting with the MOWM Board Chairman at the time, Josh Ebright; a first interview via Skype with Board members Ebright, Chris Green, and Larry Wickman; a second interview, in-person, with Board members Ebright, Green,

---

[1] *Powell v. Meals on Wheels Ministry, Inc.*, Cause No. 6:18cv240, filed in the Tyler Division of the United States District Court for the Eastern District of Texas.

Wickman, and Jennifer Hines; a meeting and interview with MOWM staff members; and a third, and final, interview with the full MOWM Board.

27.     Ms. Kietzer was fully vetted by MOWM and chosen from a competitive pool of candidates because of her exceptional qualifications and leadership.

28.     The Board unanimously voted to hire Ms. Kietzer for the position of CEO.

29.     During the interview process, Ms. Kietzer was told by various members of the Board that MOWM wanted the organization to be run more like a business.

30.     Ms. Kietzer was also advised that the books, accounts, and internal documents were in bad shape from the previous administration.

31.     The Board specifically asked Ms. Kietzer to change and/or update the processes and policies of MOWM, as well as institute policies where there were none, and enforce the policies to make MOWM run with efficiency, transparency, accountability, and professionalism.

32.     Once hired, one of Ms. Kietzer's first orders of business was to ensure the Board of Directors was compliant with nonprofit regulations and external stakeholder contracts.  This included ensuring the following documents were either updated or created: Bylaws, Investment Policy Statement, Conflict of Interest Statement, Code of Ethics, Board Responsibilities, Board Recruitment materials (including nominating documents), timeline of terms of each board member, and MOWM Strategic Plan for 2019-2021.

33.     Once hired, one of Ms. Kietzer's first orders of business was to pay outstanding debts that had long been ignored by MOWM and renegotiate contracts to the savings to MOWM.

**B.**     **Employment Agreement Between Kari Kietzer and MOWM**

34.     On or about June 14, 2018, Ms. Kietzer was hired as the Chief Executive Officer (CEO) of MOWM.

35.     The terms of Ms. Kietzer's employment, along with the mutual promises and covenants of Ms. Kietzer and MOWM were memorialized in an Employment Agreement ("Agreement"), executed on June 14, 2018.  *See* Exhibit A, Employment Agreement.

36.     Ms. Kietzer promised to serve MOWM as Chief Executive Officer, which she diligently did until she was discharged.  Exhibit A, ¶ 1.

37.     Ms. Kietzer further promised to devote substantially all of her business time and energy to the business, affairs, and interests of MOWM and related matters, and to use her best efforts and abilities to promote its interests.  *Id.*, ¶ 3.

38.     Ms. Kietzer did so, and even devoted a substantial portion of her personal time to the benefit of MOWM.

39.     Ms. Kietzer kept all of her promises.

40.     MOWM promised Ms. Kietzer additional benefits such as, two weeks paid personal leave, paid vacation leave, and paid sick leave.  *Id.* at ¶ 4.

41.     MOWM did not keep its promise.[2]

42.     MOWM promised to employ Ms. Kietzer as its CEO for a term of at least three years, unless the Employment Agreement was terminated for cause.  *Id.* at ¶¶ 1, 2, 5.

---

[2]  MOWM paid Ms. Kietzer for one week of personal leave, but not a second week, as promised.

43.     MOWM did not do so.

44.     MOWM promised Ms. Kietzer's employment would only be terminated by MOWM for cause.  *Id.* ¶ 5(a).

45.     MOWM did not keep this promise.

46.     MOWM further promised, in the event it chose to terminate Ms. Kietzer's employment, it would provide her with a written Notice of Termination.  *Id.* at ¶ 5(c).

47.     MOWM did not do so.

48.     MOWM promised that if it terminated Ms. Kietzer's employment without cause, it would pay her full base salary through the end of the term of the Employment Agreement, plus additional benefits, within 30 days of her termination.  *Id.*

49.     More than 30 days have passed since MOWM terminated Ms. Kietzer, and MOWM has not kept its promise to pay out her contract.

50.     MOWM kept some of its promises.

51.     In exchange for Ms. Kietzer's work as CEO, MOWM promised to pay Ms. Kietzer a base salary of $118,000 per year, and provide her with additional benefits such as a 401K plan, life insurance, medical insurance, vision insurance, dental insurance, payroll deduction insurance coverage, and two weeks of paid personal leave.  *Id.* at ¶ 4.

52.     MOWM did so until it wrongfully discharged Ms. Kietzer without cause on June 12, 2019.[3]

---

[3] Although MOWM paid Ms. Kietzer for one week of personal leave, MOWM did not keep its promise to pay Ms. Kietzer for a second week of paid personal leave.

53.   MOWM further promised to review Ms. Kietzer's base salary, at least yearly, in light

of her "services for the preceding period, the responsibilities which attend her office

and duties [under the Employment Agreement], [and] the profitability and progress

of MOWM." *Id.*

54.   MOWM kept this promise by reviewing Ms. Kietzer's job performance in

September/October of 2018 and increasing her base salary to $125,000 per year.

55.   The Employment Agreement specifically set forth the circumstances under which

MOWM could terminate the Agreement.

56.   Pursuant to the Agreement:

**5. Termination.**  The compensation and benefits provided for herein and the
employment of the Officer by MOWM shall be terminated only as provided
for below in this section:

(a) Cause.  MOWM may terminate the Officer's employment
under this Agreement for "Cause".  A termination for Cause is
a termination by reason of (i) a material breach of this
Agreement by the Officer . . . which is not remedied within a
reasonable period of time after receipt of written notice from
MOWM specifying such breach, or (ii) the Officer's conviction
by a court of competent jurisdiction of a felony, or (iii) entry of
an order duly issued by any federal or state regulatory agency
having jurisdiction in the matter removing the Officer from office
of MOWM or permanently prohibiting her from participating in
the conduct of the affairs of MOWM.[4]

*Id.* at ¶ 5(a).

57.   Ms. Kietzer was terminated without cause (subsection I).

58.   Ms. Kietzer was terminated without notice (subsection I).

---

[4] Section 5(a) is highlighted in the attached Exhibit A for the Court's convenience.

59.     Ms. Kietzer was terminated without a reasonable time to remedy a material breach (subsection I).

60.     Ms. Kietzer has never been convicted of a felony (subsection ii).

61.     Ms. Kietzer was not removed from office by a federal or state regulatory agency (subsection iii).  *Id.*

62.     In the event MOWM terminated Ms. Kietzer without cause, the Agreement calls for MOWM to pay Ms. Kietzer's "full base salary through the end of the term of this Agreement; plus, any Additional Benefits."[5]  Agreement, p. 3.

63.     The Agreement states "All payments required under this Agreement as a result of the termination of the Officer's employment hereunder shall be made within 30 days of the Termination Date."  *Id.*

64.     MOWM did not pay the amounts it promised to pay and did not continue Ms. Kietzer's Additional Benefits, as promised.

**C.     MOWM Terminated Ms. Kietzer Without Cause**

65.     On the afternoon of June 11, 2019, Ms. Kietzer took an employee to the doctor.

66.     While she was out of the office, she was made aware that Board Members John Genung, Trudy Williams, Josh Ebright, and Chris Green were at the office for an unscheduled meeting with her.

67.     Ms. Kietzer scheduled an appointment to meet with the Board Members the following morning at 9:00 a.m.

---

[5]  This portion of Section 5(c) is highlighted in the attached Exhibit A for the Court's convenience.

68.   On June 11, 2019, before 5:00 p.m., Ms. Kietzer's access to her email account, MOWM's server, and shared files was blocked, without notification or explanation.

69.   On Wednesday, June 12, 2019, Ms. Kietzer met with Board Members John Genung, Trudy Williams, and Chris Green in her office at MOWM.

70.   Board Chairman John Genung did most of the talking.

71.   Mr. Genung told Ms. Kietzer that a sexual harassment accusation was made against her, it was investigated, and that he believed the accusation to be credible.

72.   The Board Members refused to tell Ms. Kietzer the name of her accuser, the alleged sexual harassment, or when it supposedly happened.

73.   Mr. Genung said he did not believe anything good would come out of discussing the accusation with her.

74.   As a result, Ms. Kietzer did not have the opportunity to defend herself or to clear her name.

75.   The Board Members did not ask Ms. Kietzer her side of the story and Ms. Kietzer did not have the opportunity to offer her side because she did not know what the Board Members were talking about.

76.   To date, no proof of the allegation has been provided; therefore, the claim remains unfounded and unsubstantiated.

77.   Furthermore, the claim is defamatory.

78.   Mr. Genung told Ms. Kietzer he wanted her to make a graceful exit by letting MOWM say she chose to go back to Michigan to take care of family business.

79.   Mr. Genung stated that the story did not have to be true.

80. Ms. Williams repeatedly told Ms. Kietzer MOWM did not want the media to get wind of the situation and threatened Ms. Kietzer that if what they were discussing got to the media, the prior media coverage of her would look like a birthday party.

81. Ms. Kietzer gave the board members her building keys, company credit card, cabinet keys, and key fob.

82. Without being asked, Ms. Kietzer told the Board Members about upcoming deadlines and events and provided them the files MOWM would need for upcoming events.

83. Ms. Kietzer received nothing in writing from the Board Members and left the meeting puzzled, shocked, and hurt.

84. The decision to terminate Ms. Kietzer was made during a meeting of some Board members on June 9, 2019, not the full Board of Directors.

85. No notice of the meeting in which the decision was made to terminate Ms. Kietzer was provided to some of the Board members or to the public, which is in violation of the Open Meetings Act.

86. The same day Ms. Kietzer was terminated, all mention of her was deleted from MOWM's website.

87. Her benefits, such as health, dental, and vision insurance, were cancelled.

88. John Genung publicly announced, "Kari Kietzer is no longer with the organization. We wish her well.  We are transitioning to new leadership and will have an announcement soon."   *See* Exhibit B, Tyler Paper Article, "Leadership Change Announced at Meals on Wheels East Texas."

89.   John Genung announced Ms. Kietzer's discharge to the MOWM staff members the same day.

**D.   MOWM Quickly Hired John Moore to Replace Ms. Kietzer**

90.   A mere two days later, MOWM announced the hiring of a new Executive Director. *See* Exhibit C, Tyler Paper Article, "Meals on Wheels Names John Moore as Executive Director."

91.   John Moore is male.

92.   The decision to hire John Moore to replace Ms. Kietzer was made before June 11, 2019.

93.   The decision to hire John Moore to replace Ms. Kietzer was made by some of the MOWM Board members, not the full Board of Directors.

94.   No notice of the meeting in which the decision was made to hire John Moore to replace Ms. Kietzer was provided to some of the Board members or to the public, which is in violation of the Open Meetings Act.

95.   Ms. Kietzer did not materially breach her Employment Agreement.

96.   MOWM did not provide Ms. Kietzer with written notice specifying a material breach of the Agreement.

97.   MOWM did not give Ms. Kietzer a reasonable period of time to remedy any alleged breach of the Agreement.

98.   All of the above (in paragraphs 81, 82, and 83) must have occurred in order for Ms. Kietzer to be terminated for "Cause" under Section 5(a)(i) of the Employment Agreement.  *See* Exhibit A, ¶ 5.

99.     Ms. Kietzer was not convicted of a felony; therefore, she was not terminated for "Cause" under Section 5(a)(ii) of the Agreement.  *Id.*

100.    Likewise, Ms. Kietzer was not removed from office by order of a federal or state regulatory agency, so she was not terminated for "Cause" under Section 5(a)(iii) of the Agreement.  *Id.*

101.    The Employment Agreement is clear and unambiguous – in order to be terminated for Cause, the termination must be by reason described in either Section 5(a)(i), (ii), or (iii) of the Agreement.  *See id.*

102.    Ms. Kietzer was not terminated under any of those provisions; therefore, she was not terminated for "Cause" under the Employment Agreement.

103.    Ms. Kietzer was terminated so that MOWM could hire a male CEO.

104.    Upon information and belief, John Moore, Ms. Kietzer's male replacement was paid more in wages and other compensation than she was paid.

105.    Upon information and belief, John Moore, Ms. Kietzer's male replacement, was given more and better benefits than was given to Ms. Kietzer.

106.    Upon information and belief, John Moore was offered a severance when he left MOWM.  Ms. Kietzer was not.

107.    Upon information and belief, John Moore was offered a monetary sum in consideration for signing a Non-Disclosure Agreement.

108.    John Moore was not vetted by MOWM as stringently as Ms. Kietzer, if at all.

109.    John Moore was not required by MOWM to participate in an initial meeting with the MOWM Board Chairman before being hired to replace Ms. Kietzer.

110.　John Moore was not required by MOWM to participate in two interviews with Board members before being hired to replace Ms. Kietzer.

111.　John Moore was not required by MOWM to participate in a meeting and interview with MOWM staff members before being hired to replace Ms. Kietzer.

112.　John Moore was not required to participate in a third interview, with the full MOWM Board, before being hired to replace Ms. Kietzer.

113.　John Moore was not even required to submit an application for employment before being hired by MOWM.

114.　No employment applications were solicited by MOWM for the position of CEO before John Moore was hired.

115.　MOWM treated male employees more favorably than Ms. Kietzer in the hiring process, disciplinary process, carrying out of duties as CEO, and in pay.

116.　Greg Hudgins was the chief operations officer at MOWM while Ms. Kietzer was CEO.

117.　He was accused of sexual harassment.

118.　Mr. Hudgins was counseled about his actions, and given the following information: details about the complaint, an opportunity to respond to the complaint, and a corrective action plan which, if successfully completed, would allow him to keep his job.

119.　Mr. Hudgins was discharged after he did not complete his corrective action plan.

120.　Just like Mr. Hudgins, Ms. Kietzer was accused of sexual harassment.

121.　However, unlike Mr. Hudgins, Ms. Kietzer was not provided with the same information or opportunities as Mr. Hudgins.

122.   Specifically, Ms. Kietzer was <u>not</u> counseled about her alleged actions (MOWM never even told her the alleged actions), she was provided with <u>no</u> details of the complaint, she was <u>not</u> given an opportunity to respond to the complaint, and was <u>not</u> given a corrective action plan.

123.   On the contrary, Ms. Kietzer was merely told a complaint was made and was discharged in the same conversation.   MOWM announced to the media that Ms. Kietzer was no longer with the organization the same day she was discharged.   *See* Exhibit B.

124.   Ms. Kietzer's sexual harassment accusation was treated completely contrary to Mr. Hudgins' accusation.

125.   Mr. Hudgins was treated more favorably than Ms. Kietzer in the same circumstances.

126.   The difference between the two situations was that Ms. Kietzer is a woman and Mr. Hudgins is a male.

127.   Sex discrimination permeated the entirety of the environment in which Ms. Kietzer worked while she was CEO of MOWM despite Ms. Kietzer's efforts to change the environment for the better.

128.   A male Board Member routinely instructed Ms. Kietzer to do secretarial work in preparation for Finance Committee Meetings.   Specifically, he sent her pictures of his handwritten notes before the meeting and told her to type them.   This happened before every Finance Committee Meeting.   This was not a requirement of male CEOs Mike Powell and John Moore.

129.   A male Board Member consistently told Ms. Kietzer to "use more honey than vinegar with the Board."  He and other Board Members told Ms. Kietzer not to give direct recommendations and instructions to the Board, but instead told her to communicate her ideas to the Board in a sweeter way.   This was not a limitation on communications by male CEOs Mike Powell and John Moore to the Board.

130.   Ms. Kietzer informed the Board that it needed to get in front of an ongoing situation by issuing a press release, but the Board took no action.  Knowing it was imperative that the Board taken action and knowing the Board's history of not taking advice from women, Ms. Kietzer contacted John Moore (before he was hired to replace her) and asked him to advise the Executive Committee on the matter.  Mr. Moore gave the Board the same instruction previously given by Ms. Kietzer, and the Board took the action preciously recommended by Ms. Kietzer.  Having a male bolster Ms. Kietzer's recommendations was necessary on multiple occasions in order to prompt the Board into action.  This tactic was not necessary for the male CEOs.

131.   Members of the MOWM Board talked down to Ms. Kietzer during Finance Committee Meetings to the point that after a meeting in May of 2019, a female that was present at the meeting asked Ms. Kietzer if the Board always talked to her in such a degrading manner.  Unfortunately, at that point, the treatment had occurred for such a length of time that Ms. Kietzer was no longer shocked when it happened at that specific meeting.  The male CEOs were not spoken to in a degrading way during Board and Committee Meetings.

132. A male Board Chairman told Ms. Kietzer to wear a dress and pearls to her interview with the MOWM Board.  The male CEOs were not told what to wear to their interviews.

133. On or about November 27, 2018, Ms. Kietzer told the Board of Directors the individual members needed to make an annual gift to the organization in order to comply with the requirements of certain grant awards.  It took multiple requests by Ms. Kietzer, and over five months, before some of the Board Members complied. Other Board Members never complied.  The Board did not ignore guidance from the male CEOs.

134. Ms. Kietzer received push back and outright refusals from MOWM staff members when she told them to attend a recognition event at Gilmer Elementary School on November 30, 2018, during work hours, and traveling in company vehicles.  This type of push back was not unusual for Ms. Kietzer, but did not happen to the male CEOs.

135. Ms. Kietzer had to ask the Board multiple times to issue a press release announcing her hiring.  When the Board finally wrote something, it was poorly written, containing incorrect information and typos, so Ms. Kietzer had to correct the document. Likewise, the Board did not post an announcement on its Facebook page, so Ms. Kietzer had to create a post herself.   MOWM made timely, well-edited announcements of John Moore's hiring to the media, on Facebook, and on MOWM's website.

136.   Ms. Kietzer was not given paid vacation time, despite it being promised to her during hiring.  This was not the case for the male CEOs.  In fact, Mike Powell accrued hundreds of hours of vacation time.

137.   Ms. Kietzer's hiring process differed dramatically from John Moore's process, as more fully described herein.

138.   Ms. Kietzer's disciplinary process after allegations of sexual harassment were made against her was in stark contrast to the process MOWM offered Mike Powell and Greg Hudgins when the same allegations were made against them, as more fully described herein.

139.   MOWM's Finance Committee routinely second-guessed information Ms. Kietzer communicated to the Committee.  The information Ms. Kietzer provided was based upon the information MOWM received from Merrill Lynch every month.  The Board told Ms. Kietzer to ask the Merrill Lynch representative (a male) to attend Committee meetings and provide the updates instead of Ms. Kietzer.  The information provided by the male representative was the exact same information Ms. Kietzer provided.  The Committee reacted positively to the same information when it was communicated to them by the male representative, but second-guessed the information when it was communicated by Ms. Kietzer.  The representative did not routinely attend the meetings under the previous male CEO.  Likewise, Ms. Kietzer believes the representative's presence was not required under her replacement, John Moore.

140.   Certain members of the MOWM Board of Directors and staff became unhappy with Ms. Kietzer when she began creating and making changes that were desperately

needed at MOWM and when she began enforcing policies that were never enforced prior to her arrival.

141.   MOWM wanted Ms. Kietzer to be more ladylike.  MOWM wanted Ms. Kietzer to not disagree, not enforce the policies, not hold employees accountable, and not make changes to the old way of doing things at MOWM.  As a result, Ms. Kietzer was treated less favorably than her male counterparts.

142.   Ms. Kietzer timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

143.   Ms. Kietzer has received her Notice of Right to Sue from the Equal Employment Opportunity Commission.

144.   Since her discharge, Ms. Kietzer has suffered anxiety, humiliation, embarrassment, and stress to the point that it has caused her to require counseling and to suffer physical illnesses.

**V.**
**COUNT ONE:  SEX DISCRIMINATION**

145.   Plaintiff repeats and re-alleges the material factual allegations in the preceding paragraphs.

146.   Plaintiff belonged to a protected class based on sex.  Plaintiff was qualified for her position.   Plaintiff suffered an adverse employment action in that she was discharged from her position as CEO of MOWM.  Plaintiff was replaced by John Moore, a male person outside her protected class.

147.   Prior to her wrongful discharge, Plaintiff had faithfully served Defendant in her capacity as Chief Executive Officer and faithfully performed all duties expected of her.

148.   The acts committed by the Board of Directors, agents, servants and/or employees of Defendant in discriminating against and wrongfully terminating Plaintiff, all constitute violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Texas Labor Code.

149.   Defendant intentionally engaged in unlawful employment practices involving Plaintiff because she is a female.  Plaintiff alleges that Defendant discriminated against her based on her gender and engaged in sexual harassment.

150.   Defendant discriminated against Plaintiff in connection with compensation, terms, conditions and privileges of employment in violation of Title VIII and Chapter 21 of the Texas Labor Code.

151.   Plaintiff possesses skills equal to or greater than her male predecessor and male replacement chief executive officers.

152.   Defendant intentionally discriminated against Plaintiff on the basis of sex with malice or with reckless indifference to the protected rights of Plaintiff.

153.   The unlawful employment practices of Defendant, by and through Defendant's agents, had a disparate and adverse impact on Plaintiff because Plaintiff is a female; Such employment practices were not consistent with business necessity.

154.   An inference exists that the adverse actions were taken because of discrimination.

155.   Further, others outside of Plaintiff's protected class were treated more favorably.

# VI.
## COUNT TWO: EQUAL PAY ACT

156. Plaintiff repeats and re-alleges the material factual allegations in the preceding paragraphs.

157. Ms. Kietzer performed work at MOWM in a position requiring equal skill, effort and responsibility under similar working conditions, as her male predecessor and male replacement.

158. Ms. Kietzer's position as CEO involved work requiring substantially the same responsibility as her male predecessor and male replacement, both of which held the same title and job position as Ms. Kietzer.

159. Defendant discriminated against Ms. Kietzer by paying her less wages and other compensation, and less benefits, than her male predecessor, Mike Powell, for the same work, in the same position, in the same organization, MOWM.

160. Defendant discriminated against Ms. Kietzer by paying her less and other compensation, and less benefits, than her male replacement, John Moore, for the same work, in the same position, in the same organization, MOWM.

161. The differential in pay between Ms. Kietzer and her male predecessor and male replacement was not due to seniority, merit, quantity or quality of production, or a factor other than sex.  Instead, the differential in pay was due to Plaintiff's sex.

162. Defendant's actions were not done in good faith nor did they have any reasonable grounds for believing that their acts or omissions were not a violation of the Equal Protection Act.

163.    Defendants actions were willful and lasted for the duration of the relevant time periods.

164.    As a result, Ms. Kietzer is entitled to liquidated damages.

165.    Defendant's foregoing conduct also constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a), entitling Ms. Kietzer to recover damages for three (3) years before the date that this action was commenced pursuant to 29 U.S.C. § 255(a).

166.    Defendant's actions, as described herein, discriminated against Plaintiff in compensation in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

**VII.**
**COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

167.    Plaintiff repeats and re-alleges the material factual allegations in the preceding paragraphs.

168.    Defendant's actions described herein were intentional and/or undertaken with reckless disregarding to Plaintiff's rights.

169.    Defendant's actions described herein were extreme and/or outrageous.

170.    Defendant's actions described herein caused Ms. Kietzer emotional distress.

171.    The emotional distress suffered by Ms. Kietzer was severe.

172.    As a direct and proximate result of the wrongful conduct in treating Plaintiff worse than her male counterparts, discharging Plaintiff as described herein, replacing Plaintiff as described herein, not honoring her Employment Agreement, paying her less than her male predecessor and replacement, and as otherwise described herein, Plaintiff has been caused to suffer great anguish, shame, anger, severe

emotional distress, humiliation, embarrassment, feeling of being violated, and injury to her right to privacy.

## VII.
## JURY DEMAND

173.   Plaintiff requests a jury.

## PRAYER

WHEREAS, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant be duly cited to appear and answer herein, and that upon trial of this case, Plaintiff be awarded Judgment against Defendant for the following:

a)   Back pay and front pay, including but not limited to lost wages, amounts owed under her Employment Agreement, and other employment benefits;

b)   Promotions and benefits she would have received but for the unlawful discrimination;

c)   Compensatory damages;

d)   Prejudgment and post-judgment interest, in the maximum amount allowed by law;

e)   Attorneys' fees, expert fees, and costs of suit; and

f)   Such other and further legal and equitable relief to which Plaintiff may be justly entitled

Respectfully submitted,

**FLOWERS DAVIS, P.L.L.C.**
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063
(903) 534-1650 Facsimile

**LEE I. CORREA**
State Bar. No. 24072049
lic@flowersdavis.com

**ROBERT S. DAVIS**
State Bar No. 05544200
rsd@flowersdavis.com

**ATTORNEYS FOR PLAINTIFF
KARI KIETZER**